**UNITED STATES of America,**
**Petitioner,**

v.

**Todd CARTA, Respondent.**

**Civil Action No. 07–12064–JLT.**

United States District Court,
D. Massachusetts.

June 4, 2009.

Jennifer C. Boal, Timothy Q. Feeley, Mark J. Grady, Eve A. Piemonte–Stacey, Mark T. Quinlivan, Jennifer A. Serafyn,

United States Attorney's Office, Boston, MA, Helen H. Hong, U.S. Department of Justice, Washington, DC, for Petitioner.

Ian Gold, Page Kelley, Judith H. Mizner, Federal Defender's Office, John G. Swomley, Eric B. Tennen, Swomley & Associates, Boston, MA, for Respondent.

### MEMORANDUM

TAURO, District Judge.

### I. Introduction

Petitioner the United States of America ("the Government") instituted this civil action on March 9, 2007, seeking to commit Todd Carta ("Respondent") as a "sexually dangerous person" pursuant to the Adam Walsh Child Protection and Safety Act of 2006 ("the Act").[1] The Government's petition states that mental health personnel for the federal Bureau of Prisons ("BOP") have examined Respondent and issued a preliminary determination that he is sexually dangerous. Upon receipt of the Petition, the Act required this court to stay Respondent's release from federal custody pending a hearing to determine whether Respondent qualifies for commitment as a sexually dangerous person.

To commit Respondent, the Government must prove by clear and convincing evidence that Respondent is a sexually dangerous person, which the Act defines as "a person who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others."[2] An individual is "sexually dangerous to others" under the Act if he "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released."[3]

This court held a three-day bench trial on this matter beginning on February 9, 2009. The first witness at trial was Dr. J. Michael Wood, Respondent's treating psychologist at the Bureau of Prisons. Two experts then testified. The Government retained as an expert Dr. Amy Phenix, who opined that Respondent met the criteria for commitment under the Act. Dr. Leonard Bard testified as the court-appointed expert pursuant to 18 U.S.C. § 4247 at the request of Respondent. He testified that Respondent was not sexually dangerous under the Act. Respondent also called Dr. Randall Kent Wallace, who testified about the psychological services Respondent would be expected to receive on supervised release, and Paul Collette, a U.S. Probation Officer who provided testimony regarding Respondent's anticipated conditions of release.

At the conclusion of trial, Parties were allowed to submit proposed findings of fact and conclusions of law. After considering the testimony at trial, the evidentiary record, and Parties' submissions, this court concludes that the Government has failed to establish by clear and convincing evidence that Respondent currently suffers from a serious mental illness, abnormality, or disorder as required by the Act. In support of this decision, this court issues the following findings of fact and conclusions of law.

### II. Findings of Fact

#### A. Personal History

Respondent was sexually abused early in life. When he was seven years old, a fifteen- to sixteen-year-old male neighbor ordered Respondent to perform sex acts on another seven-year-old.[4] Between the

---

1. 18 U.S.C.A. § 4248 (West 2009).

2. Id. § 4247(a)(5).

3. Id. § 4247(a)(6).

4. Gov't Ex. 25 at 6.

ages of eight and ten, a fifteen- to sixteen-year-old family acquaintance sexually abused Respondent on at least three occasions.[5] Beginning at age fifteen, a sixty-five-year-old man had sex with Respondent weekly for a period of three to four years.[6]

Respondent began acting out sexually early in life also. Between the ages of eleven and thirteen, Respondent orally copulated a four- or five-year-old child once and his seven-year-old cousin approximately ten times.[7] At age fifteen or sixteen, Respondent propositioned a similarly aged male and shot the boy with a BB gun when he refused to engage in oral sex.[8] Respondent later "talked him into it," and they engaged in oral sex approximately twice a year over the next five years.[9]

Respondent stopped attending school around eighth or ninth grade and claims that his parents did not care if he attended or not.[10] He began consuming alcohol at age fifteen or sixteen, drinking three to four "six-packs" of beer per week at the height of his use.[11] He began using marijuana at age seventeen or eighteen and was soon experimenting with LSD.[12] Respondent's drug abuse would mushroom to approximately two ounces of marijuana per week and from three or four to fifty "hits of acid" a day during his period of heaviest use.[13]

Respondent formed his first relationship at age seventeen with a fifteen- to seventeen-year-old male.[14] When Respondent was twenty-four, he began a relationship with a seventeen-year-old female, Lucille, and the two married a year later.[15] Respondent fathered a daughter with Lucille, but the marriage ended after only nine months when Respondent had an affair with a man he described as his wife's "best friend."[16] Respondent later entered into a four- to five-year relationship with a woman named Brenda.[17]

B. *Criminal and Sexual Offense History*

Respondent's criminal history began in adolescence. When he was fifteen, he set fire to an abandoned shack and later pleaded guilty to Reckless Burning.[18] At age sixteen, Respondent began breaking into homes to steal alcohol, marijuana, and money, and he has since compiled a lengthy criminal history, which includes arrests for Larceny, Burglary, Possession of Marijuana, Criminal Mischief, Breach of Peace, and Criminal Trespass.[19]

Respondent has committed numerous sex offenses over the course of his adult life. When he was twenty-one, he performed oral sex on his sixteen-year-old nephew on multiple occasions.[20] Respondent later committed multiple sex offenses while following the band the Grateful Dead from age twenty-eight to age thirty-four.

5. *Id.*

6. *Id.* 7.

7. *Id.* 6.

8. *Id.* 7.

9. *Id.*

10. *Id.* 3.

11. *Id.* 5.

12. *Id.*

13. *Id.*

14. *Id.*

15. *Id.*

16. *Id.*

17. *Id.* 4.

18. *Id.*

19. *Id.* 3.

20. *Id.* 7.

At age twenty-eight, Respondent offered a thirteen-year-old boy concert tickets in exchange for oral sex.[21] At another point during this period, Respondent encountered a seventeen- to eighteen-year-old male passed out from drug use in Respondent's van.[22] Respondent began fondling the young man and masturbating himself until the young man woke up and yelled at Respondent.[23]

When Respondent was in his thirties, he turned to the internet in search of teenage boys.[24] Respondent would seek out sexually experienced minors, typically from troubled homes, and provide them with money, drugs, and attention in exchange for sex.[25] When Respondent was thirty or thirty-one, he began sexually abusing a thirteen-year-old boy, whom he described as his "boyfriend."[26] Respondent had sexual contact with the boy thirty to forty times over a four year period and eventually brought the boy from California to Connecticut to live with him.[27] On at least one occasion, Respondent orally copulated his then-seventeen-year-old "boyfriend's" fifteen-year-old brother.[28]

When he was thirty-nine, Respondent sexually abused a thirteen-year-old boy from "two towns over," whom he met on the internet.[29] Respondent orally copulated the boy on more than one occasion and once convinced the boy to have "three-way sex" with him and his seventeen-year-old "boyfriend."[30] Respondent also engaged in sexual contact, on separate occasions, with one sixteen-year-old female and two additional sixteen-year-old males, all of whom Respondent met on the internet.[31] Respondent was never arrested for any of his sexually abusive conduct.

On October 8, 2002, Respondent pleaded guilty to Transportation of Child Pornography in the District of Connecticut.[32] It was his first conviction for a sex offense. Respondent reports that he first became involved with child pornography in 1995 and that he typically had 10,000 to 20,000 images of child pornography in his possession.[33] Respondent once estimated the number of hours he spent viewing child pornography to be seventy hours per week, but he later reduced that estimate to five hours per week.[34] For his crime, Respondent received a sentence of sixty months in prison and three years of supervised release.[35]

## C.  *Incarceration and Treatment*

Respondent spent the first three years of his prison term at Allenwood Federal Prison in Pennsylvania.[36] There, he participated in and completed CODE, a one-year treatment program focusing on risk management, criminal thinking, and relapse prevention.[37] Respondent also ob-

21.  *Id.*

22.  *Id.*

23.  *Id.*

24.  *Id.* 8.

25.  *Id.* 9.

26.  *Id.* 7.

27.  *Id.*

28.  *Id.* 9.

29.  *Id.*

30.  *Id.* 8.

31.  *Id.*

32.  Gov't Ex. 26.

33.  Gov't Ex. 25 at 10.

34.  Trial Tr. 151:13–152:5, Feb. 10, 2009 ("Feb. 10 Tr.").

35.  Gov't Ex. 26.

36.  Resp't Ex. 9 at 6.

37.  Feb. 10 Tr. 127:5–21.

tained his GED and participated in other occupational programs and substance abuse treatment.[38] At his own request, Respondent was transferred to FCI–Butner in North Carolina to participate in sex offender-specific treatment.[39]

At FCI–Butner, Respondent participated in the Sex Offender Treatment Program ("SOTP") from July 26, 2005 to March 1, 2006.[40] SOTP is a voluntary treatment program comprised of four phases: (1) initial orientation; (2) assessment; (3) treatment; and (4) relapse prevention release planning.[41] During the initial orientation phase, Respondent was given an overview of the treatment and participated in some initial psychological testing.[42] During the assessment phase, Respondent completed a fifty- to seventy-page personal history questionnaire ("PHQ"), a detailed self-report of his sexual, criminal, and personal history.[43] In addition to revealing the history of undetected sex offenses outlined above, Respondent reported in his PHQ that his primary sexual interest was in thirteen- to twenty-eight-year-old males.[44] Respondent was then assigned a therapist, Dr. Wood, who developed a diagnosis and treatment plan specific to Respondent.[45]

After completing the first two phases of SOTP, Respondent began the treatment phase, which consisted of psycho-educational groups, group therapy, individual therapy, and community meetings.[46] According to Dr. Wood, Respondent displayed some "cognitive distortions" during therapy, stating, for example, that he believed children in the thirteen- to fourteen-year-old range could consent to sex,[47] but Respondent was willing to listen to feedback and ultimately was able to acknowledge these cognitive distortions.[48] Dr. Wood testified that such cognitive distortions are typical of men undergoing sex offender treatment.[49] More unique to Respondent was his forthrightness, a characteristic that is encouraged during treatment.[50] Dr. Wood described Respondent as "more forthcoming than [Dr. Wood] generally experienced"[51] and honest about past instances of sexual offending. Dr. Wood reported that Respondent had acknowledged enjoying therapy because it was the first time he could discuss his problems freely.[52]

Over the course of treatment, Respondent began spending a disproportionate amount of his time with nineteen- to twenty-two-year-old SOTP participants.[53] Respondent initially resisted suggestions that there was anything problematic with his close association with these younger participants, but he eventually acknowledged that he was sexually attracted to them.[54] Dr. Wood testified that there was "nothing

38. *Id.* 132:2.

39. Resp't Ex. 9 at 6.

40. Trial Tr. 52:8–11, Feb. 9, 2009 ("Feb. 9 Tr.").

41. *Id.* 48:23–49:3.

42. *Id.* 49:4–12.

43. *Id.* 49:15–24.

44. Gov't Ex. 27 at Bates Stamp p. C01030.

45. Feb. 9 Tr. 49:25–50:5.

46. *Id.* 50:8–13.

47. *Id.* 67:4–9.

48. Gov't Ex. 27 at Bates Stamp p. C00953.

49. Feb. 9 Tr. 128:23–25.

50. *Id.* 121:13–15.

51. *Id.* 125:6–13.

52. Gov't Ex. 25 at 5.

53. Gov't Ex. 27 at Bates Stamp p. C00955.

54. *Id.*

deviant" about a man Respondent's age having a relationship with nineteen- to twenty-year-old men, but expressed his opinion that it was problematic to associate with the men too closely during treatment.[55] Respondent eventually agreed that the best solution was to stop interacting with the younger participants.[56]

After struggling to avoid associating with the younger participants, however, Respondent quit the program before completing the treatment phase.[57] Respondent later told Dr. Wood that he "thought better" of his decision to quit, but was "too embarrassed" to return to the group.[58] At the time Respondent quit SOTP, Dr. Wood, with whom Respondent had a good rapport, was about to leave the program,[59] which also may have contributed to Respondent's decision.

In almost seven years of incarceration, Respondent has had only two minor disciplinary incidents. In March 2006, Respondent threatened to throw hot oil on another inmate who had threatened him.[60] Respondent's only other disciplinary violation involved possession of another inmate's property.[61]

Respondent is currently in the custody of the BOP at the Federal Medical Center, Devens, Massachusetts. His good-time release date was scheduled for March 9, 2007.[62] On March 7, 2007, Paul Sahwell, a representative of the Director of the Bureau of Prisons, certified that Respondent is a sexually dangerous person as defined by the Act, and the Government filed notice of certification on March 9, 2007.

### D. *Mental Condition*
#### 1. *Experts' Qualifications*

The court-appointed expert, Dr. Bard, interviewed Respondent for two hours on June 26, 2008 and testified on Respondent's behalf at trial. Dr. Bard is licensed as a psychologist in Massachusetts.[63] He has published five peer-reviewed articles, and he acted as a qualified examiner in sexually dangerous person evaluation proceedings for the Commonwealth of Massachusetts from 1987 to 1999.[64]

The Government's expert, Dr. Phenix, conducted an evaluation from Respondent's psychological records on September 14, 2008, but she was prohibited by court order from examining Respondent in person. Dr. Phenix holds psychology licenses from California, Florida, and Washington.[65] She has been involved in treatment or evaluation of sex offenders since 1989 [66] and has published two peer-reviewed articles and a chapter in *Innovations in Clinical Practice: A Source Book.*[67] Dr. Phenix also coauthored the coding rules for the Static–99 actuarial instrument.[68]

Both experts used the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision ("DSM–IV–TR") to diagnose Respondent. The DSM–IV–TR is a "classification manual that con-

---

**55.** Feb. 9 Tr. 139:18–140:4.

**56.** *Id.* 92:15–93:1.

**57.** *Id.* 51:1–4.

**58.** *Id.* 131:6–9.

**59.** *Id.* 131:19–25.

**60.** Gov't Ex. 28.

**61.** *Id.*; Trial Tr. 129:15–24, Feb. 11, 2009 ("Feb. 11 Tr.").

**62.** Notice of Certification as Sexually Dangerous Person [# 1] Ex. 1 at ¶ 2.

**63.** Resp't Ex. 10 at 1.

**64.** *Id.* at 3.

**65.** Gov't Ex. 2 at 1; Feb. 9 Tr. 169:8–11.

**66.** Feb. 9 Tr. 169:21–23.

**67.** Gov't Ex. 2 at 4; Feb. 9 Tr. 170:15–16.

**68.** Gov't Ex. 2 at 4.

tains all of the known research on mental disorders [and] symptoms of various mental disorders," and it is generally relied on in the field of clinical psychology.[69] Parties have not challenged the qualifications of these experts, and, after reviewing their curricula vitae and hearing their testimony, this court finds that Dr. Bard and Dr. Phenix are qualified to offer expert testimony as to the proper diagnosis of Respondent.

Dr. Phenix diagnosed Respondent with five disorders: (1) a disorder she termed paraphilia not otherwise specified: hebephilia ("paraphilia NOS: hebephilia"); (2) hallucinogen dependence; (3) cannabis dependence; (4) alcohol abuse; and (5) personality disorder not otherwise specified with antisocial and borderline traits.[70] Dr. Phenix also testified that each of these disorders was a "serious mental illness, abnormality, or disorder" and that each was "serious" for Respondent.[71]

Dr. Bard did not diagnose Respondent with any serious mental illness, abnormality, or disorder within the meaning of the statute,[72] concluding that Respondent "has numerous problems," but none that rises "to a level of a diagnosed mental condition."[73]

### 2. *Paraphilia NOS: hebephilia*

The focus of Dr. Phenix's testimony, and the key issue in this case, is her diagnosis of "paraphilia NOS: hebephilia." The term "paraphilia" refers to an individual who experiences over a period of at least six months intense, recurrent, sexually arousing fantasies, urges, or behavior involving: (1) nonhuman objects; (2) humiliation of oneself or one's partner; or (3) children and other non-consenting persons.[74] The DSM–IV–TR lists specific categories of paraphilia, such as pedophilia and sadism, but paraphilia NOS is the term used for "[p]araphilias that do not meet the criteria for any of the specific categories."[75]

Dr. Phenix diagnosed Respondent with paraphilia NOS because of his "longstanding sexual arousal to post-pubescent boys."[76] In her opinion, the term "children," as it appears in the paraphilia NOS diagnostic criteria, includes post-pubescent teenagers who have not attained the age of majority. The term "hebephilia" does not appear in the DSM–IV–TR, but Dr. Phenix testified that it is an accepted term in the field and that it has appeared in peer reviewed articles.[77] According to Dr. Phenix, the term "hebephilia" denotes, not sexual arousal to prepubescent children, but sexual preference for "young teens … 'till about age seventeen.'"[78] "Hebephilia" is not Dr. Phenix's diagnosis, however, but is merely a descriptor of Respondent's paraphilia NOS because Respondent's condition does not fit a specific paraphilia category in the DSM–IV–TR.[79]

Dr. Phenix based the diagnosis on Respondent's admissions that "he has acted out as an adult with thirteen-year-old children";[80] his history of seeking out four-

---

**69.** Feb. 9 Tr. 178:24–179:6.

**70.** Gov't Ex. 1 at 26–28; Feb. 9 Tr. 186:3–190:10.

**71.** Feb. 9 Tr. 177:18–24, 189:19–23.

**72.** Feb. 11 Tr. 106:7–10.

**73.** *Id.* 119:12–18.

**74.** Gov't Ex. 11 at 566; Feb. 9 Tr. 178:3–15.

**75.** Gov't Ex. 11 at 576; Feb. 9 Tr. 179:20–180:9.

**76.** Gov't Ex. 1 at 25.

**77.** Feb. 9 Tr. 184:5–185:1.

**78.** *Id.* 184:12–15.

**79.** *Id.* 186:1–8.

**80.** *Id.* 181:22–23.

teen- to eighteen-year-old teenagers on the internet and engaging in sex with them;[81] his self-report that his primary sexual interest was in post-pubescent boys;[82] and his possession of pornography mostly depicting children in the twelve- to seventeen-year-old age range.[83] Dr. Phenix testified that Respondent's paraphilia NOS qualifies as a serious mental illness, abnormality, or disorder because he was so fixated on his sexual interest in teenagers that "he has not been able to function as a normal human being."[84]

Dr. Bard testified that neither "hebephilia" nor "paraphilia not otherwise specified" with a descriptor of "hebephilia" is a valid diagnosis. The first problem Dr. Bard identified with the diagnosis is that adolescents do not qualify as "children or non-consenting persons" within the meaning of the paraphilia diagnostic criteria.[85] He maintained that the DSM–IV–TR makes clear that "children" refers to prepubescent youths[86] and that "non-consenting" does not refer to legal consent.[87] Second, Dr. Bard testified that the omission of hebephilia from the DSM–IV–TR indicates that it is not generally accepted in the psychiatric and psychological community.[88] Third, Dr. Bard testified that hebephilia cannot be consistently defined and there-fore has no consistent criteria that can be assessed and evaluated.[89] Fourth, Dr. Bard testified that normal adults with no sexual offending histories find sexually mature adolescents arousing.[90] Finally, Dr. Bard testified that the articles proffered by the Government in support of Dr. Phenix's hebephilia diagnosis do not qualify as legitimate, peer-reviewed research.[91]

### 3. *Personality Disorder*

Dr. Phenix's second diagnosis for Respondent is personality disorder not otherwise specified with antisocial and borderline traits. The DSM–IV–TR defines "personality disorder" as "an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, is pervasive and inflexible, has an onset in adolescence or early adulthood, is stable over time, and leads to distress or impairment."[92] The DSM–IV–TR includes ten distinct personality disorders and provides a "not otherwise specified" category for cases where the individual's "personality pattern meets the general criteria for a personality disorder and traits of several personality disorders are present."[93]

"Antisocial personality disorder is a pattern of disregard for, and violation of, the rights of others."[94] According to Dr. Phe-

---

81. *Id.* 182:2–7.

82. *Id.* 181:11–15.

83. *Id.*

84. *Id.* 186:12–20.

85. Feb. 10 Tr. 78:1–10.

86. *Id.* 174:24–175:16 ("The way the DSM talks about children is in context of pedophilia, that's all. And it talks about them in terms of prepubescent.").

87. *Id.* 174:3–23 ("[Lack of legal consent] is not what non-consent means there. The author of the DSM has written an article to clarify that. And he writes it is only supposed to be used ... for things like exhibitionism, voyeurism and sadism.... When you alter that ... to assign it to people who offend against teenagers who cannot give legal consent ... you are bastardizing that book and making it invalid.").

88. *Id.* 78:11–25.

89. *Id.* 79:1–20.

90. *Id.* 79:21–25.

91. *Id.* 80:25–81:24.

92. Gov't Ex. 15 at 685.

93. *Id.*

94. *Id.*

nix, the disorder often manifests itself in impulsive behavior, irritability, physical fights, and lack of normal remorse.[95] She testified that Respondent's numerous arrests, illicit drug use, truancy during adolescence, significant periods of unemployment as an adult, and threatening behavior in the past all demonstrate antisocial personality traits.[96] Dr. Phenix testified that Respondent's antisocial personality disorder traits amount to a serious disorder.[97]

"Borderline personality disorder is a pattern of instability in interpersonal relationships,"[98] often manifesting itself in "frantic efforts to avoid being abandoned in relationships."[99] Dr. Phenix reported that Respondent exhibited a number of traits of borderline personality disorder, including: his attempted suicide after his wife ended their brief marriage; his efforts to retaliate against sexual partners who left him by disclosing embarrassing details of their sex lives; and his aggression and hostility toward others, including family members.[100] Dr. Phenix testified that Respondent's borderline personality traits are a serious condition.[101] Dr. Phenix did not testify, however, whether personality disorder with antisocial and borderline traits would be sufficient for commitment under the Act in absence of her diagnosis of paraphilia NOS.

Dr. Bard concluded that Respondent may have met the criteria for antisocial personality disorder in the past, but does not currently meet the criteria for either personality disorder. Dr. Bard noted that Respondent had very few disciplinary infractions while incarcerated.[102] Also important to Dr. Bard was Respondent's completion of the CODE program, participation in SOTP,[103] and his expressions of remorse to Dr. Bard during his examination.[104] With respect to borderline personality disorder, Dr. Bard noted that Respondent was able to develop a good relationship with Dr. Wood in SOTP.[105] According to Dr. Bard, "personality disorders don't just change no matter if you're incarcerated or not, you would expect to see the same pattern, at least in some ways."[106] Finding that Respondent did not exhibit his old pattern of antisocial and borderline behavior, Dr. Bard concluded that Respondent does not currently suffer from a serious personality disorder.

### 4. *Substance Abuse Disorders*

Dr. Phenix also diagnosed Respondent with hallucinogen dependence, cannabis dependence, and alcohol abuse.[107] She testified that Respondent meets the DSM–IV–TR criteria for hallucinogen dependence because of his lengthy use of LSD in his twenties and thirties.[108] She based her diagnosis of cannabis dependence on Respondent's continuous marijuana use from his late teens until his incarceration at age forty-one.[109] Although Dr. Phenix confess-

95. Feb. 9 Tr. 190:23–191:13.
96. *Id.* 191:20–194:16.
97. *Id.* 194:17–24.
98. Gov't Ex. 15 at 685.
99. Feb. 9 Tr. 195:19–24.
100. Gov't Ex. 1 at 28.
101. Feb. 9 Tr. 197:24–198:2.
102. Feb. 10 Tr. 96:24–97:2.
103. *Id.* 97:3–7.
104. *Id.* 97:17–24.
105. *Id.* 100:13–22.
106. *Id.* 96:18–23.
107. Feb. 9 Tr. 187:2–7.
108. *Id.* 187:23–188:13.
109. *Id.* 188:14–189:6.

ed having "less information about his alcohol intake," she also diagnosed Respondent with alcohol abuse based on his heavy alcohol consumption prior to his incarceration.[110] Dr. Phenix testified that each of these various substance abuse diagnoses signifies a serious mental illness, abnormality, or disorder for Respondent because use of any of these substances could disinhibit Respondent when he is experiencing deviant sexual arousal.[111]

Dr. Bard acknowledged that Respondent "could probably be diagnosed" with substance abuse disorders, but Dr. Bard did not consider Respondent's substance abuse problems in his report because they did not appear to be a significant part of his offense pattern.[112]

### E. Difficulty Refraining from Child Molestation

Dr. Phenix and Dr. Bard also offered expert testimony as to whether Respondent would have serious difficulty refraining from future acts of child molestation if released. To assess Respondent's risk of reoffending, both experts used some version of an "actuarial risk assessment method," in which one or more empirically validated actuarial instruments is used to set a baseline level of risk, which may then be adjusted based on empirically validated dynamic factors.[113]

Using this method, Dr. Phenix concluded that Respondent's risk of recidivism was 13.4% to 27.7% after five years and 16.7% to 37.3% after ten years.[114] In her opinion, these rates satisfy the criteria for commitment.

Dr. Bard estimated that Respondent's risk of recidivism, adjusted for age, was 13.8% over five years.[115] He opined that this percentage did not satisfy the criteria for commitment under the Act.

### F. Post–Release Conditions

If not committed as a sexually dangerous person, Respondent would be released from BOP custody and begin serving a three-year term of supervised release. The United States Probation Office for the District of Connecticut contracts with The Connection, Inc. to provide sex offender treatment to all sex offenders on supervised release in the state of Connecticut,[116] where Respondent would be released. Respondent presented testimony from Dr. Randall Kent Wallace, a psychologist and administrator at The Connection.[117] Dr. Wallace testified that The Connection uses a cognitive behavioral treatment model with specific interventions to address sex offender risk factors. Treatment includes regular therapy sessions and polygraph examination and lasts a minimum of eighteen months to three years or more.[118]

Respondent also called United States Probation Officer Paul Collette, an officer responsible for supervising sex offenders in Connecticut.[119] Officer Collette testified that, if released, Respondent would be subject to rigorous conditions of supervised release, including sex offender registration,[120] "passive GPS" monitoring,[121] prohi-

---

110. *Id.* 189:7–13.

111. *Id.* 189:19–190:6.

112. Feb. 10 Tr. 102:1–13.

113. *Id.* 6:2–12, 104:22–105:17.

114. *Id.* 16:1–6.

115. *Id.* 122:13–19.

116. *Id.* 52:12–23.

117. *Id.* 11:16–12:2.

118. Resp't Ex. 11 at 21.

119. Feb. 11 Tr. 45:14–20.

120. *Id.* 51:3–52:15; *see also* Conn. Gen.Stat. Ann. § 54–251:257 (West 2009).

121. Feb. 11 Tr. 55:1–16.

bitions on computer access,[122] and unannounced visits to his residence.[123] Officer Collette testified that he has a zero tolerance policy and would immediately arrest Respondent and seek to have his probation revoked should he go near a school or otherwise violate his terms of release.[124]

### III. *Conclusions of Law*

The Government has the burden of proving that Respondent is a "sexually dangerous person" under the Act. To meet this burden, the Government must make two primary showings: (1) that Respondent has "engaged or attempted to engage in sexually violent conduct or child molestation" in the past; and (2) that Respondent "is sexually dangerous to others."[125] The sexual dangerousness determination in turn requires two findings: (a) that Respondent "suffers from a serious mental illness, abnormality, or disorder"; and (b) that Respondent "would have serious difficulty in refraining from sexually violent conduct or child molestation if released."[126]

### A. *Child Molestation in the Past*

■ The first criterion for commitment under the Act is a finding that Respondent has "engaged or attempted to engage in sexually violent conduct or child molestation" in the past.[127] Counsel for Respondent argued at trial that Respondent has not committed child molestation because the "sexually mature" minors he sexually abused were not "children," a word counsel for Respondent maintained "evokes the image of a prepubescent."[128] Both experts at trial agreed, however, that at least some of Respondent's sexual contact with pubescent or post-pubescent minors qualifies as child molestation under the Act.[129] Additionally, BOP regulations interpret the term "child molestation" under the Act to include "any unlawful conduct of a sexual nature with, or sexual exploitation of, a person under the age of 18 years."[130] In light of the concurring expert opinions and the BOP regulations, this court declines to adopt Respondent's suggestion, apparently now abandoned,[131] that child molestation pertains only to prepubescent children.

This court concludes that the following conduct constitutes child molestation under the Act: (1) Respondent's sexual activity with a thirteen-year-old male whom he coerced into engaging in sexual activity in exchange for concert tickets when Respondent was twenty-eight; (2) Respondent's four-year sexual relationship with the boy he brought from California to Connecticut, which began when Respondent was thirty or thirty-one and the boy was thirteen; and (3) Respondent's sexual activity with a thirteen-year-old boy whom he met over an internet chat line when he was thirty-nine. Having decided that Respondent's sexual contact with thirteen-year-olds constitutes child molestation within the meaning of the Act, it is unnecessary to determine whether Respondent's sexual activity

**122.** *Id.* 58:1–59:6.

**123.** *Id.* 54:1–9.

**124.** *Id.* 56:16–57:1.

**125.** 18 U.S.C.A. § 4247(a)(5).

**126.** *Id.* § 4247(a)(6).

**127.** *Id.* § 4247(a)(5).

**128.** Feb. 9 Tr. 18:24–19:14.

**129.** *Id.* 176:22–17; Feb. 10 Tr. 153:20–154:8.

**130.** 28 C.F.R. § 549.93 (2008); *see also United States v. Abregana*, 574 F.Supp.2d 1145, 1158 (D.Haw.2008) ("The term child molestation means any unlawful conduct of a sexual nature with, or sexual exploitation of, a person under the age of 18 years.").

**131.** *See* Resp't Proposed Findings of Fact & Conclusions of Law 7 at ¶ 21.

with adolescents in their later teens also amounts to sexual molestation.

B. *Serious Mental Illness, Abnormality, or Disorder*

■ The second showing required of the Government is that Respondent currently suffers from a serious mental illness, abnormality, or disorder. The Government has the burden of proving this element by clear and convincing evidence.[132] "[T]he individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity" that this standard is required not only by the Act, but by the Due Process clause of the Constitution.[133] The clear and convincing evidence standard is an "intermediate standard," lying somewhere "between preponderance of the evidence and proof beyond a reasonable doubt." [134] In other contexts, the First Circuit has described the standard variously as "stiff," [135] "stringent," [136] "rigorous," [137] a "high threshold," [138] a "heavy burden," [139] and a "high hurdle." [140] The Government must produce "[e]vidence indicating that the thing to be proved is highly probable or reasonably certain." [141]

1. *Paraphilia Not Otherwise Specified: Hebephilia*

■ Although Dr. Phenix diagnosed Respondent with five disorders, all of which she described as serious, the focus of the Government's case was on her diagnosis of paraphilia NOS: hebephilia. As explained above, Dr. Phenix used the term "hebephilia" to describe sexual interest in post-pubescent adolescents age seventeen and under.[142] The only federal courts to have addressed the diagnosis of hebephilia in sexually dangerous person cases have rejected it as a basis for commitment. In *United States v. Shields*, Judge Saris of this district, who conducted the commitment hearing before an advisory jury, ruled that hebephilia was not a valid diagnosis and was not admissible expert testimony under *Daubert*.[143] Judge Saris concluded that "while [the] literature may establish that hebephilia is generally accepted in the field as a group identifier or label, it does not establish that hebephilia is generally accepted as a mental disorder by professionals who assess sexually violent offenders." [144]

In *United States v. Abregana*, the court assumed that a diagnosis of paraphilia NOS: hebephilia was valid, but concluded

**132.** 18 U.S.C.A. § 4248(d).

**133.** *Addington v. Texas*, 441 U.S. 418, 427, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979).

**134.** *Id.* at 425, 99 S.Ct. 1804.

**135.** *Palma–Mazariegos v. Keisler*, 504 F.3d 144, 147 (1st Cir.2007); *see also Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1084 (9th Cir. 2002) (stating that the clear and convincing standard imposes a "burden[ ] far in excess of the preponderance sufficient for most civil litigation" (internal quotation and citation omitted)).

**136.** *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 925 (1st Cir.1988) ("We are keenly aware of the stringency of this standard. . . .").

**137.** *Agosto–de–Feliciano v. Aponte–Roque*, 889 F.2d 1209, 1220 (1st Cir.1989).

**138.** *Palma–Mazariegos*, 504 F.3d at 147.

**139.** *Rashad v. Walsh*, 300 F.3d 27, 35 (1st Cir.2002); *Jordan Hosp., Inc. v. Shalala*, 276 F.3d 72, 76–77 (1st Cir.2002); *AccuSoft Corp. v. Palo*, 237 F.3d 31, 50 (1st Cir.2001); *Anderson*, 862 F.2d at 925.

**140.** *Colon–Millin v. Sears Roebuck De Puerto Rico, Inc.*, 455 F.3d 30, 37 (1st Cir.2006); *Creighton v. Hall*, 310 F.3d 221, 229 (1st Cir.2002); *Mastracchio v. Vose*, 274 F.3d 590, 598 (1st Cir.2001); *Perez–Perez v. Popular Leasing Rental, Inc.*, 993 F.2d 281, 285 (1st Cir.1993).

**141.** *Black's Law Dictionary* 596 (8th ed. 2004).

**142.** Feb. 9 Tr. 184:12–15.

**143.** No. 07–12056–PBS, 2008 WL 544940, at *2 (D.Mass. Feb. 26, 2008).

**144.** *Id.*

that it was not a "serious" mental disorder for the respondent within the meaning of the Act.[145] For the reasons stated below, this court similarly concludes that the Government has failed to prove by clear and convincing evidence that paraphilia NOS: hebephilia is a serious mental illness, abnormality, or disorder within the meaning of the Act.

### a. Hebephilia Diagnosis Not Clearly Supported by DSM–IV–TR

The first obstacle the Government faces in establishing that hebephilia is a valid diagnosis is that the term is not found in the DSM–IV–TR.[146] The DSM–IV–TR "is a classification manual that contains all of the known research on mental disorders."[147] It "allows mental health workers to have an agreement on various mental disorders" and is generally relied on in the field of clinical psychology.[148] Dr. Bard testified that if a diagnosis is not found in the DSM–IV–TR, it is not generally accepted by the psychiatric and psychological community.[149]

Dr. Phenix did not diagnose Respondent with hebephilia, however, but with paraphilia not otherwise specified with a descriptor of hebephilia. Dr. Phenix testified that the paraphilia NOS diagnosis is proper whenever a patient meets the criteria for paraphilia but none of the specific categories of the disorder applies.[150] But there is at least some question whether the general criteria for paraphilia are in fact applicable to Respondent. The DSM–IV–TR identifies the essential features of a paraphilia as intense, recurrent, sexually arousing fantasies, urges, or behavior involving (1) nonhuman objects; (2) humiliation of oneself or one's partner; or (3) children and other non-consenting persons.[151] The only feature that potentially applies to Respondent is sexual arousal to children and other non-consenting persons, but neither term is defined in the criteria.

Although the Government would have this court construe both terms to include anyone below the legal age of consent, it is not clear whether that is how the terms are understood by the medical community.[152] The only reference to children in the paraphilia diagnostic criteria is with respect to pedophilia, defined as sexual focus on prepubescent children.[153] Dr. Bard testified at trial that he believed a majority of clinicians interpret the term "children" in the paraphilia diagnostic criteria to refer exclusively to prepubescent children.[154] With respect to the definition of "non-consenting persons," Dr. Bard, reading from an article written by Dr. Allen Frances, an editor of *DSM–IV Task Force*, testified that "[t]he term non-consenting person was meant to apply only to exhibitionism, voyeurism and sadism."[155]

Even assuming that post-pubescent teenagers could qualify as children or non-

---

145. 574 F.Supp.2d at 1159.

146. Feb. 10 Tr. 78:11–25.

147. Feb. 9 Tr. 178:24–179:2.

148. *Id.* 179:2–6.

149. Feb. 10 Tr. 78:11–13.

150. Feb. 9 Tr. 180:3–9.

151. Gov't Ex. 11 at 566; Feb. 9 Tr. 178:3–15.

152. *See Kansas v. Hendricks*, 521 U.S. 346, 359, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) ("Legal definitions, however, which must 'take into account such issues as individual responsibility ... and competency,' need not mirror those advanced by the medical profession.") (quoting American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* xxiii, xxvii (4th ed. 1994)).

153. Gov't Ex. 11 at 566.

154. Feb. 10 Tr. 175:4–16.

155. *Id.* 174:13–17.

consenting persons within the meaning of the general paraphilia diagnostic criteria, it is not clear that the paraphilia NOS diagnosis is broad enough to include hebephilia. Dr. Bard testified that normal adults with no sexual offending histories find sexually mature adolescents to be arousing.[156] But the DSM–IV–TR introduces paraphilia NOS as a "residual category" that "includes other Paraphilias that are *less frequently encountered.*"[157] The manual goes on to state that "[t]his category is included for coding Paraphilias that do not meet the criteria for any of the specific categories. Examples include, but are not limited to, telephone scatologia (obscene phone calls), necrophilia (corpses), partialism (exclusive focus on part of body), zoophilia (animals), coprophilia (feces), klismaphilia (enemas), and urophilia (urine)."[158] Although the list of examples is plainly not exhaustive, it is difficult to conceive why the DSM editors would limit examples of paraphilia NOS to rare sexual fixations such as coprophilia and klismaphilia if the category were intended to include a sexual interest as common as attraction to post-pubescent adolescents. The DSM–IV–TR criteria thus do not clearly support a paraphilia NOS diagnosis for an individual who is sexually aroused by post-pubescent minors.

b. *"Hebephilia" Not Clearly Defined*

Another problem with a diagnosis of hebephilia or paraphilia NOS: hebephilia is that it has no consistent criteria. Dr. Bard testified that people who have proposed definitions for "hebephilia" have offered inconsistent definitions.[159] Some have proposed that any sexual interest in adolescents is a paraphilia, while others have proposed that only a sexual preference for adolescents would qualify as paraphilic.[160] Given that the research indicates normal adult males experience sexual arousal to sexually developed adolescents,[161] this definition of hebephilia could pathologize normal men.

Similarly problematic is determining what age range qualifies as adolescence. The age of legal consent is of no use to psychologists seeking a uniform diagnostic standard because the age of consent varies from jurisdiction to jurisdiction.[162] It is one thing to criminalize conduct in one state that is legal in another. It is quite another to label a sexual interest pathological in Pennsylvania and normal in New York. Adopting one standard cutoff age below which sexual interest is considered deviant has problems of its own. Because sexual maturity at any given age varies from individual to individual, age alone is not a reliable measure of sexual development.[163] Defining adolescents by body type has the same problem because the only clear, uniform line that psychologists can draw in sexual development is pubescence.[164]

Another consideration that has not been adequately addressed by those proposing a paraphilia of hebephilia is the extent to which the difference in age between the adolescent and the adult affects the diagnosis.[165] Should an eighteen-year-old, for

---

**156.** *Id.* 79:21–24.

**157.** Gov't Ex. 11 at 567 (emphasis added).

**158.** *Id.* at 576.

**159.** Feb. 10 Tr. 79:1–13.

**160.** *Id.*

**161.** *Id.* 79:21–24; Feb. 11 Tr. 37:15–21.

**162.** Feb. 10 Tr. 80:3–12.

**163.** *See id.* 70:14–20 ("There are 13–year–olds who look like 18–year–olds. There are 18–year–olds who look like 13–year–olds.").

**164.** *Id.* 70:11–13.

**165.** *Id.* 80:13–21.

example who is sexually interested in a fifteen-year-old be treated the same as a fifty-year-old interested in the same fifteen-year-old? At trial, the Government failed to answer these concerns, even putting forward inconsistent definitions of hebephilia.[166]

In short, the term "hebephilia" may have some value as a general descriptor of sexual interest in adolescents, but the lack of any clear criteria in the proposed definitions demonstrates that hebephilia is not a workable diagnosis.

### c. Diagnosis of Hebephilia Not Clearly Supported by Research

Finally, and most importantly, the Government has failed to demonstrate that a diagnosis of hebephilia or paraphilia NOS: hebephilia is supported by research in the field of psychology. Dr. Phenix defended her opinion that hebephilia "is an accepted term" in the field by explaining that "it's recognized by those of us who work in the field diagnostically. If someone comes to me and says ... I've provided this diagnosis, I know exactly what it means."[167] Dr. Bard testified that a diagnosis is not generally accepted in the psychiatric and psychological community if it is not in the DSM–IV–TR.[168]

Dr. Phenix also testified that some peer reviewed articles support a diagnosis of hebephilia,[169] but Dr. Bard responded that peer-reviewed research supporting a pa-

thology of hebephilia is extremely limited and scientifically problematic.[170] Although not in evidence, the Government questioned Dr. Bard about numerous sources that reference hebephilia. Most of the articles put forward by the Government were published by coauthors Dr. Blanchard and Dr. Cantor.[171] Dr. Bard criticized the work of Dr. Blanchard and Dr. Cantor, testifying that they are both on the editorial board of the journal that publishes their findings,[172] which has at least the potential to damage the integrity of the peer-review process. Dr. Bard also criticized the research underlying their conclusions for failing to include a control group and for eliminating a large portion of the samples, among other problems.[173] The five replies criticizing Dr. Blanchard's recent article proposing inclusion of hebephilia in the DSM–V suggest that Dr. Blanchard's work is not widely accepted.[174] Dr. Bard testified that "it's the same group that is published over and over again trying to justify [a diagnosis of hebephilia,] and they have failed."[175]

In addition to the research by Cantor and Blanchard, the Government questioned Dr. Bard about a number of books referencing hebephilia. Dr. Bard testified that none of the books contained research, but merely labeled attraction to adolescents as hebephilia.[176] The Government also referred Dr. Bard to the testimony of

---

166. As noted above, Dr. Phenix testified that hebephilia signifies a "preference for young teens to ... about age 17." Feb. 9 Tr. 186:1–8. The Government also questioned Dr. Bard about an article entitled *Pedophilia, Hebephilia, and the DSM–V*, in which the authors appear to propose an age range of eleven or twelve to fourteen and acknowledge that "few would want to label erotic interest in late or even mid adolescents as a psychopathology." Feb. 11 Tr. 111:3–112:16, 114:3–8.

167. Feb. 9 Tr. 184:5–12.

168. Feb. 10 Tr. 78:11–13, 176:20–177:3.

169. *Id.* 184:16–185:1.

170. Feb. 11 Tr. 73:11–81:5.

171. *Id.* 73:25–78:20.

172. Feb. 10 Tr. 81:7–9.

173. *Id.* 81:9–17.

174. *Id.* 81:18–24.

175. *Id.* 79:13–15.

176. Feb. 11 Tr. 79:1–80:25.

Dr. Howard Barbaree in *United States v. Abregana,* in which Dr. Barbaree appears to recognize hebephilia as a valid diagnosis, and Dr. Bard agreed that Dr. Barbaree was a well-respected expert in the field. Dr. Barbaree did not opine in *Abregana,* however, that hebephilia was a serious mental disorder, but rather characterized it as "a descriptive term that can be applied to a particular sexual interest." [177] Dr. Barbaree continued, "Whether it constitutes a mental disorder or not, I'm not sure. And I would say that ... the degree of pathology is much less than with the other paraphilias." [178] The court in *Abregana* no doubt relied on Dr. Barbaree's characterization of hebephilia when deciding that paraphilia NOS: hebephilia was a valid diagnosis, but not a serious mental illness, abnormality, or disorder under the Act.

As evidence that the diagnosis is accepted in the community, the Government pointed to Dr. Wood's diagnosis of Respondent with paraphilia NOS: hebephilia, though he was not offered as an expert in this case and was an intern at the time of the diagnosis.[179] The Government also sought to elicit information regarding hebephilia during its cross-examination of Dr. Wallace, but he too was not formally submitted as an expert.[180] When asked whether he had treated people with hebephilia, Dr. Wallace responded simply, "Hebephilia is not an actual diagnosis." [181] In his opinion, the "problem" with a diagnosis of hebephilia is that "all of the research essentially says that all males or males in general who are not sexual perpe-trators have an equal amount of sexual attraction to post-pubescent females as they do with an adult female." [182] In sum, the testimony of the psychologists in this case and the research presented to them at trial indicate that hebephilia is not generally recognized as a serious mental illness by the psychological and psychiatric communities.

### d. *Government's Burden Not Met*

For the reasons above, this court concludes that the Government has failed to meet its heavy burden of proving by clear and convincing evidence that Respondent's sexual interest in pubescent and post-pubescent adolescents qualifies as a serious mental illness, abnormality, or disorder within the meaning of the Act. In doing so, this court recognizes both the seriousness of Respondent's criminal conduct and the Government's strong interest in protecting post-pubescent minors from sexual coercion. A finding that Respondent's sexual interest in adolescents does not clearly constitute a serious medical disorder at this time does not excuse Respondent's past criminal activity.

As Dr. Bard testified, "[p]sychologically Mr. Carta has numerous problems. Just because somebody has problems doesn't mean that it arises to a level of a diagnosed mental condition." [183] Dr. Bard testified further that "[t]here are many other people [who are sexually attracted to adolescents] out there. They have used better judgment than [Respondent] has. They have not sought to go below the age of consent. That's what makes [Respon-

---

177. *Id.* 122:22–24.

178. *Id.* 122:24–123:5.

179. Feb. 10 Tr. 83:9–15.

180. This court considers his opinion because the Government was the party eliciting his testimony regarding hebephilia. Dr. Wallace testified that he has been qualified as an expert in the field of sexual offending on multiple prior occasions. *Id.* 37:22–38:2.

181. *Id.* 36:14–17.

182. *Id.* 37:15–21.

183. Feb. 11 Tr. 119:12–14.

dent's] behavior illegal and it should be punished and it certainly has been." [184] Dr. Wallace also recognized that Respondent has a "behavioral problem," but stated that it does not amount to a medical disorder. [185] Respondent has exercised "poor impulse control," [186] and his acting on his attraction to minors is "illegal," "harmful," and "exploitative." [187] But the Government has not shown that the sexual attraction itself is deviant. [188]

This distinction between criminal conduct and pathological illness is relevant not only under the Act but under the Constitution. Addressing the constitutionality of state laws providing for civil commitment of sexually dangerous persons, the Supreme Court has stated,

A finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary commitment. We have sustained civil commitment statutes when they have coupled proof of dangerousness with the proof of some additional factor, such as a mental illness or mental abnormality. These added statutory requirements serve to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control. [189]

It is the province of the criminal legal system to punish misconduct. The civil commitment regime, in contrast, if it is to maintain its non-punitive character, must concern itself not with punishing wrongdoing but with commitment and treatment of offenders suffering from serious mental illness and actual volitional impairment. Such a regime by its very nature requires courts to rely on the expertise of trained psychiatrists and psychologists, who are better positioned than federal courts to define the boundaries of mental illness. Where, as here, the psychiatric and psychological community does not recognize an offender's sexual interest as a serious mental disorder, this court cannot order indefinite commitment on the basis of the offensiveness of Respondent's conduct alone.

### 2. *Personality Disorders*

■ The Government has also failed to show that Respondent currently has a personality disorder rising to the level of a serious mental illness, abnormality, or disorder. Dr. Phenix diagnosed Respondent with personality disorder not otherwise specified with antisocial and borderline traits, basing her diagnosis almost entirely on incidents earlier in Respondent's life. Dr. Bard agreed that Respondent has met the criteria for antisocial and borderline personality disorders in the past, but testified that Respondent does not currently meet the criteria. [190]

During Respondent's seven years of incarceration, the Government can point to only two minor disciplinary violations. Even Dr. Phenix agreed that Respondent committed only a "couple of more minor violations," and that "by and large he was

---

184. Feb. 10 Tr. 85:11–15.

185. Feb. 11 Tr. 39:6–7.

186. *Id.* 119:15–16.

187. Feb. 10 Tr. 85:20–22.

188. *See id.* 83:7–15 (Dr. Bard testified that "sexual interest in pubescent adolescents, those who show secondary sex characteristics[,] is not deviant. Acting on that arousal is illegal if the individual is not over the age of consent. We don't pathologize based on the law. We pathologize based on what we know in the research. And there is nothing in the research that says that attraction to adolescents is in any way, shape or form deviant.").

189. *Hendricks*, 521 U.S. at 358, 117 S.Ct. 2072 (internal quotation and citation omitted).

190. Feb. 10 Tr. 96:12–25.

not a person who was continuously violating rules of the institution or the treatment program." [191] An individual experiencing great difficulty conforming his conduct to the rules of society would exhibit the same pattern of bad behavior while incarcerated, but Respondent has not done so.[192] Dr. Phenix testified that an individual suffering from antisocial personality disorder does not experience normal remorse,[193] but Respondent has expressed remorse at what he has done.[194] During treatment, he acknowledged his many wrongdoings much more openly than Dr. Wood expected.[195] Additionally, Respondent's completion of his GED and participation in occupational programs, substance abuse treatment, CODE and SOTP during incarceration all show some improvement in Respondent's willingness to change.[196] Absent more current evidence of antisocial behavior, it is not clear that Respondent currently suffers antisocial personality disorder.

Dr. Phenix's diagnosis of borderline personality disorder is also based on Respondent's behavior before incarceration. "Borderline personality disorder is a pattern of instability in interpersonal relationships," [197] often manifesting itself in "frantic efforts to avoid being abandoned in relationships." [198] Dr. Bard testified that he no longer detected signs of instability in Respondent's interpersonal relationships.[199] Respondent apparently developed a good therapist-patient relationship with Dr. Wood, although he did quit SOTP around the time Dr. Wood was leaving the program.[200] Respondent's decision to quit SOTP was in all likelihood also related to his interactions with younger program participants. But Respondent has not exhibited a pattern of stormy interpersonal relationships and rapid vacillations in prison to the extent that he did in the past.

According to the DSM–IV–TR, it is not out of the ordinary for antisocial and borderline personality traits to decrease over time. Although the DSM–IV–TR indicates that a personality disorder is by definition "enduring" and "relatively stable over time," the criteria also indicate that "[s]ome types of Personality Disorder (notably, Antisocial and Borderline Personality Disorders) tend to become less evident or to remit with age." [201]

Even were this court to conclude that Respondent currently suffers antisocial or borderline personality disorder, the Government never addressed whether personality disorders would be sufficient for civil commitment absent the existence of a paraphilia. This court thus finds that the Government has failed to show by clear and convincing evidence that Respondent currently suffers a personality disorder that is sufficient for commitment under the Act.

### 3. *Substance Abuse Disorders*

■ Dr. Phenix also diagnosed Respondent with hallucinogen dependence, cannabis dependence, and alcohol abuse.[202] The Government produced no evidence, however, that Respondent's drug and alcohol abuse significantly contributed to his histo-

**191.** *Id.* 32:7–14.

**192.** *Id.* 96:18–23.

**193.** Feb. 9 Tr. 191:11–13.

**194.** Feb. 11 Tr. 97:17–24.

**195.** Feb. 9 Tr. 125:6–13.

**196.** *See* Feb. 10 Tr. 97:3–7.

**197.** Gov't Ex. 15 at 685.

**198.** Feb. 9 Tr. 195:19–24.

**199.** *Id.* 99:7–18.

**200.** *Id.* 131:19–25.

**201.** Gov't Ex. 15 at 688.

**202.** Feb. 9 Tr. 187:2–7.

ry of sexual offending. The Government has thus failed to show that Respondent's drug and alcohol problems constitute a serious mental illness, abnormality, or disorder sufficient for civil commitment under the Act.

### C. *Serious Difficulty Refraining*

Having decided that the Government has failed to prove that Respondent suffers a serious mental illness, abnormality, or disorder, this court need not address the third criterion for commitment under the Act.

### IV. *Conclusion*

For the foregoing reasons, the Government has failed to show by clear and convincing evidence that Respondent currently suffers a serious mental illness, abnormality, or disorder within the meaning of the Act. Accordingly, this court concludes that Respondent is not a sexually dangerous person and orders his RELEASE from BOP custody.

AN ORDER HAS ISSUED.

### ORDER OF JUDGMENT

For the reasons set forth in the accompanying Memorandum, this court concludes that the Government has failed to establish by clear and convincing evidence that Respondent is a sexually dangerous person and, therefore, orders his RELEASE from the custody of the federal Bureau of Prisons.

IT IS SO ORDERED.