# United States Court of Appeals
## For the First Circuit

Nos. 08-2455, 09-1018

UNITED STATES OF AMERICA,

Appellee,

v.

KENDRA D'ANDREA and WILLIE JORDAN,

Defendants, Appellants.

———————————

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Richard G. Stearns, U.S. District Judge]

———————————

Before
Torruella and Lipez, Circuit Judges,
and Smith,* District Judge.

———————————

Judith H. Mizner, with whom Behzad Mirhashem and Federal
Defender Office, District of Massachusetts were on brief, for
appellant Kendra D'Andrea.
Terrance J. McCarthy for appellant Willie Jordan.
J. Cam Barker, Criminal Division, Appellate Section, with whom
Carmen M. Ortiz, United States Attorney, Lanny A. Breuer, Assistant
Attorney General, Criminal Division, and Greg D. Andres, Deputy
Assistant Attorney General, Criminal Division, were on brief, for
appellee.

———————————

May 10, 2011

———————————

———————

* Of the District of Rhode Island, sitting by designation.

**SMITH**, **District Judge**.  Defendants-appellants Kendra D'Andrea and Willie Jordan separately appeal their convictions following conditional guilty pleas.  For the reasons set forth below, we hold that the district court erred in denying defendants' motions to suppress without an evidentiary hearing, vacate the judgments, and remand for an evidentiary hearing on the suppression motions.

## I.   The Facts

The following facts are essentially undisputed except as otherwise indicated.  At around 6:30 p.m. on December 2, 2004, a woman (the "Tipster") called the Judge Baker child abuse hotline of the Massachusetts Department of Social Services ("DSS").[1]  She said she resided in California and had a child with defendant Willie Jordan, but requested to remain anonymous.[2]  The Tipster identified defendants Kendra D'Andrea and Willie Jordan as partners, provided D'Andrea's residential address,[3] and identified Jordan's employer of the past two months, a trucking company based in Missouri, by name.  She informed DSS that she had received a message on her mobile phone containing photographs of D'Andrea and Jordan performing sexual acts on D'Andrea's eight-year-old daughter (the

---

[1] DSS is now called the Department of Children and Families.

[2] Her identity is now known to the parties.

[3] There is a factual dispute as to whether the Tipster actually provided D'Andrea's address.  This is discussed below in Part II(B).

"victim") and of the victim with her genitalia exposed. (Apparently D'Andrea had intended to send the text message to Jordan but had sent it to the Tipster by mistake.) The Tipster said the pictures could be accessed by going to www.sprintpcs.com and entering a certain phone number and pass codes, which she provided to the DSS intake agent.[4]

Shortly after receiving the anonymous call, DSS agents reported it to the Gloucester, Massachusetts Police Department to alert them to this possible case of child abuse. After several unsuccessful attempts at accessing the website and at least one other telephone conversation with the Tipster, DSS agents were able to access the website, where they found numerous pornographic pictures of the victim consistent with the Tipster's report. A DSS agent printed out more than 30 of these photographs and took them to the Gloucester Police Department. Three telephone numbers, two of which appeared to be alternate numbers for the same person (Jordan), and some text messages also appeared on the website along with the pictures. In some of the text messages, the person associated with one of the phone numbers, later revealed to be

---

[4] At the time, Sprint enabled its mobile telephone subscribers to store pictures and videos taken with their mobile phones on password-protected online accounts at www.sprintpcs.com. These pictures and videos were accessible only to those who had the appropriate username and password for the account. (It also appears that there were codes associated with particular pictures.) The account at issue in this case was a password-protected online account of this nature under Jordan's name and used by Jordan and D'Andrea.

Jordan, asks for more pornographic pictures of the victim to be sent by the person with one of the other phone numbers, later revealed to be D'Andrea.

After viewing the pictures, a detective with the Gloucester Police Department applied for a warrant to search D'Andrea's residence for files that may contain evidence of child abuse and child pornography. The warrant affidavit stated that the Tipster had told DSS that the child abuse was occurring at D'Andrea's residence in Gloucester at an address she provided, and that a Registry of Motor Vehicles check had indicated that D'Andrea had a revoked Massachusetts license with the same address as that provided by the Tipster. The warrant was signed at midnight and the search commenced ten minutes later. The searching officers found D'Andrea and her two little children, one of whom was the victim, at the residence.[5] They seized, among other things, a mobile camera phone containing pornographic pictures of the victim, one of them showing her with her genitals exposed and the other showing Jordan performing oral sex on her.[6] D'Andrea was taken into custody and admitted that both she and Jordan had sexually abused the victim. She also admitted that she would take

_____

[5] There are indications in the record that the other child, a three-year-old, may also have been sexually abused, but defendants were indicted only for the victim's abuse.

[6] It is not clear from the record whether the pornographic pictures found on D'Andrea's phone were identical to any of the pictures on the website.

pornographic pictures of the victim with her mobile phone, send them to Jordan's mobile phone, and upload them on the Sprint website so that Jordan could view them. The authorities subsequently obtained an arrest warrant for Jordan and arrested him in Michigan.

When the police knocked on D'Andrea's door on the morning of December 3, she called Jordan, whereupon Jordan contacted Sprint and deleted the account. Therefore, the copies printed by the DSS agent appear to be the only surviving copies of the images on the Sprint website.

After being indicted, defendants moved to suppress the images, the evidence seized from D'Andrea's home (including the camera phone), and D'Andrea's incriminating statements on the grounds that all of it was obtained in violation of their Fourth Amendment right to be free from unreasonable searches and seizures. The district court denied the motions without holding an evidentiary hearing. It also denied defendants' motion for a Franks hearing to challenge the veracity of the warrant affidavit. Defendants then entered conditional pleas of guilty to sexual exploitation of a child and conspiracy to sexually exploit a child, reserving their right to appeal the denial of the motions to suppress and the motion to hold a Franks hearing. The district court sentenced Jordan to 30 years in prison and restitution in the

amount of $67,600, and D'Andrea to 27 years in prison and restitution in the amount of $67,600.[7]

Defendants separately appeal their convictions, raising five issues:  Whether the district court erred in (1) denying defendants' motions to suppress without holding an evidentiary hearing, (2) denying the requests for a Franks hearing without holding an evidentiary hearing, (3) imposing an unreasonably high prison sentence, (4) denying Jordan's request to be present and allocute at the restitution hearing, and (5) failing to hold an evidentiary hearing to determine the appropriate amount of restitution.

## II.  Analysis

### A.    The Motions to Suppress

Defendants' first claim of error targets the district court's denial of the motions to suppress without conducting an evidentiary hearing.  A criminal defendant does not have a presumptive right to an evidentiary hearing on a motion to suppress.  United States v. Brown, 621 F.3d 48, 57 (1st Cir. 2010) (citing United States v. Panitz, 907 F.2d 1267, 1273 (1st Cir. 1990)).  "A hearing is required only if the movant makes a sufficient threshold showing

---

[7] The government's brief and some of the district court docket entries reference the amount of restitution imposed on D'Andrea as $148,200.  This appears to be a clerical error, as the orders of restitution for both D'Andrea and Jordan state that an equal amount of restitution will be imposed on the two, and Jordan's restitution order makes clear that the amount of loss for purposes of restitution is $135,200.  (Jordan Add., Restitution Order at 2.)

that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record. . . . Most importantly, the defendant must show that there are factual disputes which, if resolved in his favor, would entitle him to the requested relief." United States v. Staula, 80 F.3d 596, 603 (1st Cir. 1996) (citations omitted).

A district court's denial of an evidentiary hearing is reviewed for abuse of discretion. Id.; United States v. Lewis, 40 F.3d 1325, 1332 (1st Cir. 1994). In considering the denial of the motions to suppress, the district court's factual findings are reviewed for clear error and its legal conclusions, including ultimate constitutional determinations, are reviewed de novo. Lewis, 40 F.3d at 1332-33 (citing United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994)).

A search within the meaning of the Fourth Amendment "occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." Kyllo v. United States, 533 U.S. 27, 33 (2001). A warrantless search is unreasonable unless one of the recognized exceptions to the warrant requirement applies. See, e.g., Coolidge v. New Hampshire, 403 U.S. 443, 468 (1971). The exclusionary rule, where applicable, requires suppression of evidence obtained in violation of the Fourth Amendment. Herring v. United States, 129 S. Ct. 695, 699 (2009).

The focus of defendants' appeal of the denial of the motions to suppress is the DSS agent's accessing the Sprint PCS website and downloading and printing the pictures uploaded there. Because the Tipster was a private actor, her unauthorized viewing of the website did not implicate the Fourth Amendment. See United States v. Jacobsen, 466 U.S. 109, 113 (1984).[8] Nor did the police search of D'Andrea's residence, on its own, violate the Fourth Amendment, because it was carried out pursuant to a warrant. If the DSS agent's accessing the website violated the Fourth Amendment, however, evidence obtained during the ensuing police search of the D'Andrea residence may be inadmissible because it was "tainted" by the earlier violation and became "fruit of the poisonous tree." See Wong Sun v. United States, 371 U.S. 471, 484-88 (1963).[9]

_____

[8] D'Andrea suggests that the Tipster's initial viewing of the online account was not a private act but a "joint endeavor" carried out with government support. The record belies this claim. The Tipster had accessed the account and viewed the incriminating pictures, which she subsequently described in detail to DSS agents who had not yet seen them, before she called DSS and without the participation or even knowledge of governmental authorities. See infra at 17 (citing First Circuit decisions discussing the factors to be considered in distinguishing private and government action for Fourth Amendment purposes).

[9] If the DSS agent's accessing the website violated the Fourth Amendment, it does not necessarily follow that evidence from the police search of the D'Andrea residence is "tainted" and inadmissible. Rather, the question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Wong Sun, 371 U.S. at 488. We have no occasion here, nor enough facts, to address the fruit of the

There can be no serious debate, and the government does not dispute, that defendants had a subjective expectation of privacy in their password-protected online account and that this expectation of privacy was, at least initially, reasonable. Nor is there any question that the DSS agent's unauthorized accessing of the website constituted a warrantless search. The question presented is whether the warrantless search was nonetheless valid because an exception to the warrant requirement applied or there were circumstances defeating the reasonableness of defendants' expectation of privacy. The government presses three theories: (1) the private search doctrine; (2) emergency intervention; and (3) inevitable discovery.

### 1. The Private Search Doctrine

The district court held that the search was reasonable. Its reasoning is central to this appeal, and deserves to be set forth at length (Order at 9-10):

> Defendants make no argument – nor could one credibly be made – that the anonymous caller was acting as an agent of the State . . . . The argument rather is that the DSS administrator (Curley) who accessed the website and downloaded the images of the abuse violated defendants' Fourth Amendment rights. This argument fails for the simple reason that

---

poisonous tree issue. If, after an evidentiary hearing, the district court determines that the DSS violated the Fourth Amendment in accessing the website, it would need to inquire whether the subsequent evidence obtained from the search of the house and mobile phone and D'Andrea's confession should be suppressed as fruits of a poisonous tree, or whether the taint had been dissipated in the interim.

Curley intruded no further into defendants' zone of privacy than did the anonymous caller. Where a private party, acting on his or her own, searches a closed container, a subsequent warrantless search of the same container by government officials does not further burden the owner's already frustrated expectation of privacy. <u>United States</u> v. <u>Jacobsen</u>, 466 US 109, 117 (1984). . . . Moreover, where an expectation of privacy in an item has been effectively destroyed by a private search, police do not violate the Fourth Amendment by examining the same item more thoroughly or with greater intensity so long as they do not 'significantly expand' upon or 'change the nature' of the underlying private search . . . .

At day's end, this case falls clearly into the 'assumption of the risk' exception . . . . 'It is well-settled that when an individual reveals private information to another, he assumes the risk that his confidant will reveal that information to the authorities, and if that occurs the Fourth Amendment does not prohibit governmental use of that information.' <u>Jacobsen</u>, 466 U.S. at 117. . . . Thus, even granting defendants a reasonable expectation of privacy in the graphic website images of Jane Doe, by sharing the website access information with the anonymous caller, defendants took the risk that their right to privacy in the website's contents could be compromised.

The district court was correct in identifying <u>Jacobsen</u> as the key case governing this area of Fourth Amendment law, where a government search follows on the heels of a private search.  In <u>Jacobsen</u>, FedEx employees opened an accidentally damaged package to examine its contents pursuant to a company policy regarding insurance claims.  466 U.S. at 111.  They found a suspicious white powdery substance inside, put the substance back into the container

(but did not re-seal it), and summoned DEA agents.  Id.  DEA agents came, took the substance out of the box again, and removed a trace of it for a field test, which revealed that it was cocaine.  Id. at 111-12.

One of the issues presented was whether the DEA agents' reopening of the box and removal of the substance violated the defendant's Fourth Amendment rights.  As in this case, in Jacobsen the initial private search did not implicate the Fourth Amendment because it was conducted by a private party.  Id. at 113.  The question was whether the DEA agents' seizure of the drugs, which followed on the heels of the private search, violated the Fourth Amendment.  The Court, per Justice Stevens, held that it did not. Id. at 120-21.  It ruled that the "additional invasions of respondents' privacy by the Government agent must be tested by the degree to which they exceeded the scope of the private search." Id. at 115.  Because the DEA agent's seizure did not exceed the scope of the initial FedEx employees' search, held the Court, the "agent's viewing of what a private party had freely made available for his inspection did not violate the Fourth Amendment."  Id. at 119-20.

In applying the Jacobsen private search doctrine to this case, we must keep in mind several principles.  To begin, it is clear that just because a private party violates a person's expectation of privacy does not mean that the expectation of

privacy no longer exists or is not reasonable. See Walter v. United States, 447 U.S. 649, 658 n.12 (1980) (Stevens, J.) (rejecting the argument that petitioners' expectation of privacy was "undone" by a private search, because "it is difficult to understand how petitioners' subjective expectation of privacy could have been altered in any way by subsequent events of which they were obviously unaware"); see also Jacobsen, 466 U.S. at 132 (White, J., concurring) ("As Justice Stevens has previously observed, . . . a person's expectation of privacy cannot be altered by subsequent events of which he was unaware." (citing Walter, 447 U.S. at 659 n.12)). Rather, the Court in Jacobsen was careful to point out that its private search "standard follows from the analysis applicable when private parties reveal other kinds of private information to the authorities. It is well settled that when an individual reveals private information to another, he assumes the risk that his confidant will reveal that information to the authorities, and if that occurs the Fourth Amendment does not prohibit governmental use of that information." Id. at 117.

In this case, the assumption of the risk, if any, goes to how the Tipster obtained the account access information. On this score, contrary to the district court's finding, there is no evidence in the record that defendants "shar[ed] the website access information with the anonymous caller." (Order at 10.) Quite the opposite, both defendants affirmed in sworn affidavits that they

-12-

did not share the password with anyone. Moreover, in a February 2007 interview, the Tipster told an investigator for the Federal Public Defender Office that she pieced together the password by surreptitiously taking scraps of paper on which Jordan had jotted down various letters and numbers. Therefore, on this record, the district court's factual finding that defendants shared the password with the Tipster was clearly erroneous.

It is possible that an evidentiary hearing would unearth facts to support a finding of assumption of the risk--for example, if Jordan or D'Andrea were so careless with the password that one of them assumed the risk of its disclosure. Further, it is mentioned on one of the DSS information sheets that "[t]he pictures had been forwarded to the site and various responders with web-names had written to many pictures with comments of a highly sexualized nature." (D'Andrea Sealed App. 3.) This arguably implies that defendants had shared the site with others. If, however, as D'Andrea and Jordan have sworn, they never shared the password with anyone and reasonably believed no one else could get into the account, assumption of the risk would not be present. In sum, an evidentiary hearing is needed to explore whether the circumstances under which the Tipster obtained the account access information evince that defendants assumed the risk that the security of their account would be compromised.[10]

---

[10] Other circuit courts of appeals applying Jacobsen have considered circumstances evincing an assumption of the risk. See

Secondly, because the record does not provide meaningful details on the searches of the website by the Tipster and the DSS, we do not have enough evidence to determine whether the DSS search of the website exceeded the scope of the Tipster's search. This is important, because under Jacobsen the "additional invasions of respondents' privacy by the Government agent must be tested by the degree to which they exceeded the scope of the private search." 466 U.S. at 115. Thus, the evidentiary hearing should explore whether DSS obtained any of the pictures by exceeding the scope of the Tipster's search. To the extent it did, those pictures are not admissible under the private search doctrine.[11]

United States v. Grimes, 244 F.3d 375, 383 (5th Cir. 2001) (defendant's wife entrusted his computer to a computer repairman, who searched the computer's hard drive to delete unnecessary files pursuant to her permission and "following standard company practice"); United States v. Mithun, 933 F.2d 631, 634 n.3 (8th Cir. 1991) (noting that by leaving firearm accessories in "relatively plain view" in a vehicle which he turned over to hotel valets for parking, defendant "assumed the risk that hotel employees would discover the contraband and reveal that information to the authorities"); United States v. Boyer, 914 F.2d 144, 146 (8th Cir. 1990) (defendant entrusted suspicious package to FedEx, whose employees opened it before resealing it and turning it over to DEA agents); United States v. Paige, 136 F.3d 1012, 1020 (5th Cir. 1998) ("[C]onsideration must be given to whether the activities of the home's occupants or the circumstances within the home at the time of the private search created a risk of intrusion by the private party that was reasonably foreseeable.").

[11] This does not mean that if the government search exceeded the private search in certain respects, the evidence is inadmissible even to the extent which the government search did not exceed the scope of the private search. To hold so would amount to punishing lawful conduct (searching within the scope) to deter unlawful conduct (searching outside the scope). The unlawful conduct is sufficiently deterred by excluding the evidence flowing from it. Moreover, it would be practically unworkable for the DSS

-14-

Finally, the Court in Jacobsen pointed out that when the federal agent arrived to inspect the package, "there was a virtual certainty that nothing else of significance [except for the white powder to which the FedEx employees had alerted him] was in the package and that a manual inspection of the tube and its contents would not tell him anything more than he already had been told." 466 U.S. at 118-19. By requiring that the government expect its search to reveal "nothing else of significance" other than the evidence to which they were tipped off by the private party, the Court was emphasizing that an antecedent private search does not amount to a free pass for the government to rummage through a person's effects. The same principle is expressed in the Supreme Court's jurisprudence in the context of the plain view doctrine. See Coolidge, 403 U.S. at 466 ("[T]he 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges."); accord Arizona v. Hicks, 480 U.S. 321, 328 (1987). To comply with this limitation, the evidentiary hearing should explore whether, in accessing the website, the DSS agents were virtually certain that it contained nothing of significance except for the pictures of

---

agent to avert his eyes from everything else on the website and see only the pictures that the Tipster saw. Therefore, if the government search exceeded the scope of the Tipster's search, only that part of the evidence that was obtained by exceeding the scope of the private search falls outside the purview of the Jacobsen doctrine and is inadmissible.

-15-

child pornography, or whether they also expected to discover something else.

The district court also failed to explore an important threshold issue. Namely, even though the facts make clear that the Tipster's initial hacking into the website before she called the authorities was a private search (see supra note 8), it is not clear whether the Tipster had to hack into the website a second time, possibly with the aid of the authorities, before she successfully directed them to the website. Specifically, some of the DSS call sheets suggest that DSS was unable to access the website after the Tipster's initial call, and possibly even after a second call. (See D'Andrea Sealed App. 2.) This raises the possibility that the Tipster did not have the correct password when she called the authorities.[12] If that is indeed the case, the record is unclear as to whether the Tipster re-hacked the website and, if so, whether the authorities actively assisted her in this second attempt.

This issue is important because a search carried out by a private party in conjunction with government efforts may no longer qualify as a private search immune from the Fourth Amendment. See United States v. Momoh, 427 F.3d 137, 140-41 (1st

---

[12] Of course, this is merely a possibility and by no means the only inference to be drawn from the opaque record. It may be, for example, that the Tipster provided all the correct information, and the initial failure to access the website resulted from a mistake on DSS's part, in which case no additional Fourth Amendment issue arises.

Cir. 2005) (enumerating the following factors as relevant in distinguishing private and government action for Fourth Amendment purposes: "the extent of the government's role in instigating or participating in the search, its intent and the degree of control it exercises over the search and the private party, and the extent to which the private party aims primarily to help the government or to serve its own interests" (quoting United States v. Pervaz, 118 F.3d 1, 6 (1st Cir. 1997))); United States v. Silva, 554 F.3d 13, 18 (1st Cir. 2009) (restating the aforementioned factors but noting that "[w]e will not find state action simply because the government has a stake in the outcome of a search"). Accordingly, on remand, the district court should explore whether the Tipster had to re-hack the website before she could give DSS the correct password; whether the DSS or other authorities were involved in the re-hacking; and whether, under the factors enunciated in Pervaz and its progeny, the re-hacking amounted to a government search and not a private search.

If the district court finds that there was a second hacking and that it amounted to a government search rather than a private search, then it should inquire whether the gap in surveillance of the website restored defendants' expectation of privacy in its contents. See Illinois v. Andreas, 463 U.S. 765, 773 (1983) (holding that an expectation of privacy in the contents of a container, even if lawfully frustrated, may be regained by a

-17-

gap in surveillance; provided only, however, that "there is a substantial likelihood that the contents of the container have been changed during the gap in surveillance").

## 2. **Exigent Circumstances**

A warrantless search unreasonable under ordinary circumstances may be reasonable if undertaken under certain exigent circumstances, for example "to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." Brigham City v. Stuart, 547 U.S. 398, 403 (2006). The district court mentioned in a footnote that this emergency intervention exception "provides a sufficient alternative basis on which to uphold the search of D'Andrea's apartment." (Order at 10 n.18.)

The district court's application of the emergency aid exception is somewhat cursory, no doubt because the Court relied primarily on Jacobsen. Because we have negated that holding, we consider whether, on this record, exigent circumstances justify the warrantless search by DSS. We agree with the district court that "powerful evidence" of child abuse was received by DSS. But the record does not indicate that abuse was then ongoing or that further abuse was imminent. Nor does it explain how the Tipster-- who told DSS she resided in California and never claimed to have been present at the time of the abuse or to have known about it when it was going on--could have known whether further abuse was

-18-

imminent at the time she called DSS.[13]  On the present record, it is not possible to know whether there was anything in the text message she received, dated several days before the call to DSS, that alerted her to the possibility of imminent abuse.  Nor do we know from the record what, if anything, she told DSS regarding imminent abuse.

Moreover, we cannot say with certainty, based on the record as it currently stands, that the Tipster's uncorroborated call provided probable cause that a crime was committed.  See, e.g., Florida v. J.L., 529 U.S. 266, 271-72 (2000) (holding that an anonymous telephone tip that a young black male wearing a plaid shirt and standing at a particular bus stop was carrying a gun was, without more, insufficient to establish reasonable suspicion for a Terry stop and frisk (let alone probable cause) when the police found the described person with the described clothing at the bus stop).  This is significant because exigent circumstances is an exception to the warrant, not the probable cause, requirement.  See Brigham City, 547 U.S. at 403 (describing exigent circumstances as an exception to the warrant requirement); see also United States v. Wilson, 36 F.3d 205, 208 (1st Cir. 1994) ("To cross the apartment's threshold, [the officer] needed (1) probable cause to believe that

_____

[13] The government concedes that an objectively reasonable belief in the imminence of the harm is a requirement for the emergency intervention exception.  (Brief at 22 (citing authorities)); see, e.g., Brigham City, 547 U.S. at 403 (referring to "imminent injury").

-19-

contraband or evidence would be found inside, and (2) exigent circumstances justifying an exception to the warrant requirement, allowing him to enter without first obtaining a warrant.") (emphases added); United States v. Martins, 413 F.3d 139, 147 (1st Cir. 2005) ("To rely upon the [emergency aid] doctrine, the government must show a reasonable basis, approximating probable cause, both for the officers' belief that an emergency exists and for linking the perceived emergency with the area or place into which they propose to intrude.") (emphasis added).  The sum of all this is that the district court's reliance, in the alternative, on exigent circumstances is not supportable on the current state of the record.  An evidentiary hearing is needed to flesh out the facts to determine whether the Tipster's tip provided probable cause and whether the authorities had an objectively reasonable belief in the imminence of harm.[14]

### 3.    Inevitable Discovery

The government argues that even if the DSS search violated the Fourth Amendment, the evidence is admissible under the inevitable discovery doctrine.  This doctrine provides that evidence obtained by violating the Fourth Amendment is nevertheless

---

[14] The evidentiary hearing may also explore another exigency that was not addressed by the district court or in the parties' briefs on appeal (though it was addressed at oral argument)-- namely, whether the DSS agents responding to the call were justified in accessing the Sprint account out of concern that the pictures evidencing the abuse might be destroyed.

admissible "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." Nix v. Williams, 467 U.S. 431, 444 (1984). We have identified "three basic concerns" to keep in mind in deciding whether to apply the inevitable discovery doctrine: "are the legal means truly independent; are both the use of the legal means and the discovery by that means truly inevitable; and does the application of the inevitable discovery exception either provide an incentive for police misconduct or significantly weaken fourth amendment protection?" United States v. Silvestri, 787 F.2d 736, 744 (1st Cir. 1986). In this Circuit, there is no requirement that the independent line of investigation that would have led to the inevitable discovery be already underway at the time of the illegal discovery. Id. at 746; United States v. Ford, 22 F.3d 374, 377 (1st Cir. 1994).[15] Rather, the analysis must "focus on the questions of independence and inevitability and remain flexible enough to handle the many different fact patterns which will be presented." Silvestri, 787 F.2d at 746.

_____

[15] Other circuits are divided over whether to impose this requirement. Compare United States v. Cherry, 759 F.2d 1196, 1205-06 (5th Cir. 1985), and United States v. Satterfield, 743 F.2d 827, 846 (11th Cir. 1984) (both holding that, for inevitable discovery to apply, an independent line of investigation must have been underway at the time the evidence was obtained by unlawful means), with United States v. Boatwright, 822 F.2d 862, 864 (9th Cir. 1987) (Kennedy, J.), United States v. Thomas, 955 F.2d 207, 210 (4th Cir. 1992), and United States v. Kennedy, 61 F.3d 494, 499-500 (6th Cir. 1995) (all rejecting the requirement of an ongoing independent line of investigation).

In light of the Supreme Court's warning that "inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment," Nix, 467 U.S. at 444 n.5, we cannot say that the present record contains all the facts necessary to enable an informed determination on the applicability of the inevitable discovery doctrine. An evidentiary hearing could explore whether the evidence would have been discovered independently and inevitably.

For the foregoing reasons, the district court erred in denying defendants' motions to suppress without holding an evidentiary hearing. An evidentiary hearing is warranted to determine whether the DSS agent's warrantless search of the Sprint account violated defendants' Fourth Amendment rights. The hearing would reveal facts sufficient to enable an informed decision on the private search doctrine, exigent circumstances, inevitable discovery, and any other potentially applicable Fourth Amendment doctrines.

## B. The Franks Hearing

"[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment

requires that a hearing be held at the defendant's request." Franks v. Delaware, 438 U.S. 154, 155-56 (1978).

The crux of D'Andrea's Franks request is that the affidavit in support of the search warrant misrepresented a nexus between the abuse and D'Andrea's home. D'Andrea argues that while the Tipster did provide information about the abuse, she did not relay D'Andrea's address or in any way link the abuse with her home. D'Andrea does not dispute that all pertinent affidavits and reports prepared by the police state that the Tipster provided D'Andrea's address and reported abuse occurring there; rather, she claims that the Tipster did not in fact report this to DSS and that DSS recklessly or intentionally relayed misleading information to the police.

The district court denied the Franks request, finding it "flawed by two fundamental errors, one legal, and the other factual." (Order at 11.) The legal error, according to the district court, was that a Franks hearing examines alleged misrepresentations by an affiant, not an informant--and, by extension, not a DSS agent. Thus, the district court held that, even assuming the DSS agent misrepresented the Tipster's call as conveying a link between D'Andrea's home and the child abuse, the request for a Franks hearing must be denied because there has been no showing that the affiant was in any way responsible for this misrepresentation. On the factual front, the district court relied

on a copy of the original DSS Intake Information Form to find that the Tipster did in fact provide D'Andrea's address and did link the abuse to her home.

The "legal" basis for the district court's decision--that Franks does not apply to misstatements by DSS agents--is reviewed de novo. See United States v. Hicks, 575 F.3d 130, 136 (1st Cir. 2009); Lewis, 40 F.3d at 1332-33. It is undisputed that a Franks hearing cannot test the truthfulness of the Tipster (or of any other private informant, for that matter). See Franks, 438 U.S. at 171 ("The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant.") (emphasis added). But it does not necessarily follow that a Franks hearing cannot test the truthfulness of the DSS agent. The DSS agent was, after all, a government actor (a conclusion the government does not dispute), so he cannot be conveniently lumped together with the private Tipster. Nor should Franks be read to apply only to misrepresentations made by the affiant himself, because such a reading would allow the police to slip lies into affidavits with impunity by simply passing them through an officer ignorant of their falsehood. Franks, 438 U.S. at 164 n.6 ("[P]olice could not insulate one officer's deliberate misstatement merely by relaying it through an officer-affiant personally ignorant of its falsity.").

-24-

This does not mean that Franks necessarily applies to DSS agents or other similarly situated governmental actors; rather, it means that such a determination requires an examination and weighing of the policies served and disserved by applying Franks, the kind of inquiry the Supreme Court has grappled with when deciding whether to apply other Fourth Amendment doctrines to non-police governmental actors in other contexts. See, e.g., New Jersey v. T.L.O., 469 U.S. 325, 333-37 (1985) (deciding whether the Fourth Amendment applies to actions of public school officials); Arizona v. Evans, 514 U.S. 1, 14-16 (1995) (deciding whether the exclusionary rule applies to evidence seized in violation of the Fourth Amendment by an officer who acted in reasonable reliance on an erroneous record furnished by a court employee). Deciding whether to apply Franks to DSS agents, in general and in this case in particular, would likewise require a thorough analysis of the policies implicated and whether they would be served by application of Franks.

It is unnecessary to decide this question, however, because the district court's "factual" ground for denying the Franks hearing is free from clear error. See Hicks, 575 F.3d at 138 ("We review the denial of a Franks hearing for clear error . . . which exists only when we are left with the definite and firm conviction that a mistake has been committed.") (citations and quotation omitted). As the district court found, the record

supports the conclusion that the Tipster did provide D'Andrea's address and did link the child abuse to her home.[16]

Even if she had not, DSS and the police could have drawn these inferences from other information she provided.  The address could be (and was) easily confirmed by checking D'Andrea's driver license records.  And the nexus to D'Andrea's home was apparent from the circumstances:  The detailed report, corroborated in its most incriminating parts, that an itinerant truck driver and his girlfriend were abusing the girlfriend's child and posting images of the abuse on the Internet, and that the girlfriend would send pornographic pictures of the victim via her mobile phone to the truck driver when he was away, established probable cause that some

_____

[16] The address appears on the initial DSS Intake Information Form.  (D'Andrea Sealed App. 6-7.)  The DSS agent who took the Tipster's call wrote that the Tipster "is unsure where the mother's partner [i.e., Jordan] resides."  (D'Andrea Sealed App. 11.)  Certainly this does not mean that the Tipster was also unsure where D'Andrea herself resided.  Indeed, given that the DSS agent reported that the Tipster was unsure where Jordan resided, it is reasonable to infer that, had the Tipster said she was unsure where D'Andrea resided, the DSS agent would have reported that too.  The fact that this is not reported, coupled with the fact that D'Andrea's address is actually reflected on the form (D'Andrea Sealed App. 6-7), means that the Tipster in all likelihood did provide D'Andrea's address.  It was not clear error for the district court to find that this contemporaneous information was more reliable than the Tipster's after-the-fact statement in February 2007 to the Public Defender's investigator that she did not know D'Andrea's address and could not have given it to DSS.  (See D'Andrea Sealed App. 124.)  Even assuming, arguendo, that the Tipster did not in fact report the address, it certainly was not clear error for the district court to find that defendants' request did not contain sufficiently concrete and well-supported "allegations of deliberate falsehood or of reckless disregard for the truth," as mandated by Franks, 438 U.S. at 171 (emphasis added).

-26-

of the abuse was occurring at the girlfriend's home or, at the very least, that some evidence of the crime could be found at the home. Thus, the explicit linking of the abuse to the home by the Tipster was not "necessary to the finding of probable cause," as required by <u>Franks</u>, 438 U.S. at 155-56.

Therefore, while the district court erred in holding categorically that <u>Franks</u> does not apply to DSS agents, we agree with the district court's factual determination that defendants did not make the "substantial preliminary showing" required to entitle them to a <u>Franks</u> hearing. <u>See</u> <u>id.</u>

## IV. Conclusion

For the foregoing reasons, the judgments of the district court are VACATED and the case is REMANDED for an evidentiary hearing on the motions to suppress.[17]

---

[17] Because our holding that the district court erred in denying defendants' motions to suppress without an evidentiary hearing leads to a vacatur of defendants' convictions, we need not address the sentencing and allocution issues.